McKechnie Vehicle, Appeal 1167 from 2008 Mr. Underwood, good morning to you. Good morning, Your Honors. Please proceed. Thank you. May it please the Court. In this case, Your Honors, there had been no commercial before the critical date, and there was no evidence that whatever Lacks did unambiguously required the use of the claim methods of the 213 patent at that time. The plaintiff in this case, Lacks, respectfully submits that the Special Master did not follow this Court's mandate, that it ignored the legal standard of Group 1, and how do we deduce that? When an adjudicator cites a case and purports to apply the case, but counsel says, well, they really didn't do it. They said they did it, but they really didn't do it. How can we deduce that conclusion? Well, Your Honors, the mandate expressly required that the Special Master apply the UCC to the circumstances surrounding Lacks' efforts to promote interest in its… But I thought you just said that the Special Master declined to follow the intervening case. We submit by not applying the UCC as appropriately required by the mandate, Your Honors. Your Honor, you, in your opinion, expressly instructed him to determine whether or not there was a sale under the UCC. And under the UCC, first of all, if there was a sale, it would be subject to the statute of frauds. In all of the five instances… We're not talking about a sale here, sir. We're talking about an offer of sale. I'm sorry? There never was a sale. We're talking about an offer for sale. That's correct. Right. But an offer isn't defined by the UCC. Well, respectfully, Your Honor, in order for there to be a claim to be made against another party, that offer has to be in writing. What the record shows here is that given the practice in the industry, which I don't understand you to have appealed, trying to appeal what the Special Master did about that, is that given the activity that Lacks engaged in, in the ordinary course, that was an offer that could have been accepted by the various parties, and it would have been accepted with a writing, a writing. In due course, there would have been a writing that would have satisfied the UCC requirement, statute of frauds, and all the rest. What we're simply looking at here is was there an offer that could have led to a UCC contract. So I don't think it makes any sense to hang your hat too much on the failure of the Special Master to have tortured himself with the UCC, because the evidence he took from industry practice was that UCC contracts emerge, emerge in due course from the facts. I appreciate your comments, Your Honor. But let's look at the facts. I mean, I'm not aware of any evidence in the record where the conduct such as what Lacks involved was engaged in actually was accepted and enforced against that particular person making that supposed offer. And if there's not a situation Well, the record we have is a skimpy one where we have some law review articles from the University of Michigan about how things are done in the auto industry, and they had some testimony from some people. And I didn't understand you to be – it comes up on a summary judgment. I didn't understand you to be arguing that the case wasn't ripe for summary judgment because there were material issues of fact about what actually happens in the auto industry, right? That's correct, Your Honor. And so the record we have in front of us is the parties embraced each other warmly saying there are no disputed issues of material fact. That's correct. About what goes on in the industry. There are no disputed issues of fact about what the content of the five various documents were. And so the magistrate says since there's no issue of fact here, I'll simply look at what I think the industry practice adds up to and I'll say these are all offers, common law offers, that could have been accepted. And if they had been accepted, would have resulted in a UCC contract. So my question would be next case on the contract formation issue. Your Honor, the record is clear. You began your argument by leaning on the so-called nexus issue. That's correct. Under Plum Tree, it's our position that there's been no unambiguous requirement in any of these documents that are of record requiring the method as claimed. We understand that argument. So assume that we were to agree with you that the special master erred with regard to his law of the case, not to us. So not that I'm tipping my hand. But suppose I were to agree on that point, then what happens? Are you saying there's no issue of material fact with regard to what you were offering? Exactly, Your Honor. What were you offering then? If I may, Your Honor, let's put this in context here. We have a patent that's presumed to be valid. The defendants have the burden to come forward with clear and convincing evidence that the claims at issue here, the remaining claims, are invalid. I understand alternative review. What were you offering for sale? The record is not at all clear what we were offering to the extent if you assume that there was an offer. The 213 patent itself disclosed several methods, some of which are not included within the remaining claims. There were two other patents issued from a then-penny patent application, again, that did not call for the selective adhesive application. There were a multitude of different possibilities. If the record's not clear about what you were offering and there's a multitude of possibilities, and I respect that. I've read the whole thing. I mean, I know with the second of the two that was a Ford offer, they kind of rejected it and said, no tin-looking things for us, buddy. And that pretty much rode out the 213 method from the possibility of being used to fulfill that contract. So I think, if anything, there's actually evidence to suggest very strongly that you weren't going to be using this method to fulfill that offer. So I've seen all of that, and I understand your position on it. But with regard to the other four, what evidence is there in the record of what process was going to be used? And if there's none, then why are either of you really entitled to summary judgment at this point? Absolutely, Your Honor. It's their burden. The defendant's burden to show by clear and convincing evidence that Lacks was unambiguously required to use the method of the remaining claims. That's their burden, Your Honor, under the law. And there's no evidence, no evidence in this case whatever, to suggest that they had that unambiguous requirement. Let's assume that they failed to carry that burden on summary judgment. Then wouldn't that suggest that we say, well, the trial judge was wrong to enter a summary judgment, vacate the summary judgment, and you send it back? What I'm grappling with is how do we get where you want, which is to say reverse the summary judgment against your client on sale and enter an order saying there are no facts of record, a jury could not possibly find nexus with regard to any of the five, right? That's exactly our argument, Your Honor. Am I in a posture to do that? You're asking us to deny the summary judgment in favor of Lacks, right? First, what you want us to do is you want us to reverse the order that was against your client. Yes, sir. Okay? With no remand. And you want us to simply look at this record that was made post remand. That's right, Your Honor. Where your adversary had a chance to prove up nexus. That's right, under Rule 56. And although the trial, the special master and the trial judge didn't rule on nexus on the facts adduced post remand. They did it on law of the case that's already been decided. You want us to look at that record ourselves and say no reasonable juror could find any nexus with these five transactions. Absolutely, Your Honor. Under Rule 56, when we filed our motion for summary judgment, the defendants had the burden and obligation and duty to come forward with any evidence that would refute our position legally and factually. And with regard to nexus, they failed to do so. There's nothing for a jury to weigh, decide, or consider. There's no evidence that there's a nexus. Once the case has been committed to the special master by consent of the parties, if the special master is wrong on the summary judgment, then you necessarily prevail. That's your point. On the nexus issue, yeah. Absolutely. Because, again, they have Well, not in every case, because in some cases there might be material disputes of facts that you wouldn't necessarily get the reverse of the summary judgment granted your favor. But in this case, both parties have completely agreed that there are no material issues. Is that correct? I'm not aware of any material issues, Your Honor, with regard to the Well, wasn't, didn't they introduce evidence that this was the method that you were using for purposes of your sales? This was the method that you had developed, had, was ready for patenting, and you were using? That's the point. The point is, is that the law under Plumtree is exceptionally clear, Your Honor. It says it has to, there has to be an unambiguous requirement for lax to have used that selective application But that can come from extrinsic evidence, as Plumtree says. It doesn't have to be within the four corners of the document. So didn't they introduce evidence that this is the method you were, in fact, using? I'm not aware of any evidence that unambiguously required the use of that particular selective application technique. You're not, but couldn't a jury find that? It's not for me to find facts. No, no, no, I'm not saying you're finding facts, Your Honor, but there are no facts to find here. You're arguing Plumtree, right? I'm talking Plumtree, absolutely, Your Honor. Right, and Plumtree came down after the Special Master had ruled here. But we gave, but we submitted the ruling of Plumtree to the Special Master during a time in which he was considering a motion for some adjustment. Right, but has the other side had an opportunity to take testimony to see if they could satisfy Plumtree? I'm not sure that they had that opportunity, but they certainly had the opportunity to take the deposition of a number of different people. I mean, the Special Master is very clear on the extensive testimony that was elicited and solicited by the defendants in this matter. Let me come back. You're saying that this record doesn't provide a basis for summary judgment in favor of the defendant here, right? And cannot. Based upon the testimony that was developed. Why didn't we just reverse in Plumtree? Why didn't we vacate and revamp? Because in that case, there was apparently no way that, if I recall correctly, in Plumtree. Plumtree, yeah. The ruling was that. Plumtree said, well, the record doesn't support summary judgment on this issue. And then we vacate and revamp for further proceedings consistent with. Does that mean that we're going to be a trial on the issue? Your Honor, I think in this instance, with the extensive discovery that the defendants have been afforded by the Special Master, and I would submit that the Special Master was very indulgent in allowing them that discovery, you would have thought that in that process, they would have tried to put the logical connection between what was allegedly offered and what was the actual. I dug up from Pacer the summary judgment motions that you both filed and your responses, and it's perfectly clear that both sides post-remand took their best shot, A, at whether or not there was contract and offer, and B, whether there was nexus. So I would think your argument would be, well, the record ought to be closed on the nexus issue. That's right. And when Plumtree was decided, Your Honor, if the defendants thought that their discovery was deficient at that time, after it was submitted to the Special Master, they could have sought additional discovery at that time with the Special Master. I am absolutely confident the Special Master would have granted them that opportunity had they sought it. They did not. They didn't take the opportunity presented to them. Counsel, I also would have thought maybe your argument would be, and tell me if you're willing to adopt mine, is that Plumtree, if anything, simply enacted a higher standard for them, that the nexus standard has clearly always existed in our case law. That's not something new. The unambiguous part of it might be new, coming from Plumtree, and that your argument is they didn't meet the lower standard that had existed previously, so why send it back to see if they can meet the higher one they had? They at least knew they were burdened to meet a lower standard, which they, in effect, didn't even meet. Your Honor, I think you very, very aptly articulated a very important position of us in this particular case. All we're saying is that even under the higher standard of Plumtree, they still haven't met it. So we're saying that because of the lack of nexus, because of the vast alternatives that were available to LACs at that time, they cannot possibly win on summary judgment. Now, going back to the actual transactions or communications or documents at issue, none of them use the word offer. None of them use the word promise. They all have comments in there, this is preliminary, this is further explanation, further discussion. All of them are for the overlays themselves, not the wheels. And remember, the claim deals with the wheel assembly. Now, one of the requirements, I would think, in any type of enforceable contract or offer to make an enforceable contract is that you identify what it is that's going to be sold. And so without having specified the wheels, they haven't specifically identified the goods at issue sufficiently so as to trigger a legal offer. And again, under linear, excuse me, under Group 1, that's what we're talking about here. Is there, was there ever a time at which the information that was being provided by LACs was sufficient to have allowed the OEMs, who have a very specific requirement on their purchase orders. What about the forward offer with regard to the handwritten note? Couldn't that supply the nexus or wouldn't it at a minimum create a genuine issue of material fact over whether there was a nexus? I'm sorry, Your Honor, I didn't hear your question. The forward offer, the very first offer, the fourth one that has the handwritten note on it. Ah, the handwritten note. Why wouldn't that at least create a material fact on the nexus issue that would require remand for trial? Because we don't believe there's any facts that can support that having, A, occurred before the critical date. And we know it's in Mr. Efert's handwriting, but it's not in anybody's LACs' handwriting. That document came out of his files in 2003. We don't know how they got to his files. We don't know when he wrote that. And there's no set of facts by which we believe the defendants here can say with clear and convincing evidence that that is information that was actually communicated from LACs to Mr. Efert prior to the critical date. I believe I'm over my time. Thank you. Good morning. May it please the Court. Michael Hugin on behalf of both defendants this morning. I'd like to start, if I could, with the nexus issue. I think the record is replete with uncontradicted, uncontroverted evidence that the remaining claims were on sale. You have to go back and you have to start. How about a specific reference? Sure. I can give you a specific reference. Records say exactly what we're talking about. Absolutely. I'm happy to do that. There is the Ford offer. What page? Where are you? Oh, I'm sorry. I'm looking at my notes, but I can give you the, well, the special master talks about, at JA217, and I'm referring to the special master's opinion because he then The question is where is the evidence? I'm getting there. In trial exhibit, which would be a joint appendix 329, that's the Ford offer. Are you talking about IVERT's testimony? No. I'm talking now about the Ford. I'm starting with the Ford offer itself.  I meant JA329. JA329. How this establishes the nexus. So clearly in everything. Sure. Look at JA329. When you look at this, this is the offer that was in Mr. IVERT's files. This is what he testified he received shortly after a technology show that was put on by LAX at Ford to display this new technology. The testimony in the 2000 trial was that what was being shown was this new method, was the selective application of adhesive. What was found to be the invention of the remaining claims. If you look at here, if you look at item number two on exhibit with JA329, it has number two, mold plate assembled with five screws and RTV adhesive. The testimony of record in 2000 when we tried this case, and what the special master found back in 2001 was that when we're talking about the RTV adhesive, that was a thin silicone bead of adhesive that was applied, and there is IVERT deposition testimony post remand that we have cited at the record, and I can point you to that in a second. But what we found then, what the testimony was, that adhesive, the RTV adhesive, would be different from, for example, a foam adhesive, which they would sometimes use, that would fill the entire cavity, the gap between the cladding and the wheel. The word RTV adhesive unambiguously requires the use of the 213 tactic method. No, I'm saying the words here, RTV adhesive, in conjunction, yes, with the notes, in conjunction with the IVERT testimony. Which page of the IVERT testimony? The IVERT testimony would then be, it's cited again by the special master, but it is, for example, JA 1192, there's a series of the pages, I don't have the exact pages because I think it was the manuscript version. 1192? 1192. 1192. Where IVERT testified as follows. He said, and then I, question, and then I take it that the next line means the RTV silicone is to be placed around the lug nut, which would be the lug nut openings. Is that correct? Hold on a little bit. I'm having trouble finding it. 1192. Okay. Now, which line of which page? Pages 34, 35, 36, 37, which one? I'm looking now at 37 to 38. Okay. All right. There's a whole series of testimony here. He's talking about the 37. He says, let me see where I can pick it up, and then I take it. 16. Line 16, I'm sorry. I'm going to let you finish this, but just before, is your argument that this is going to create a material issue of fact over what was being offered for sale, whether the offer was that ambiguous, or is your, excuse me, is your position, because I understood Appellant's position to be there are no disputes or material issues of fact, and sort of both parties agree about that concept. No. You think there is a material issue of fact on that? Absolutely not. I think there is no material issue of fact. Okay. Then go ahead and point it out. I got it. Go ahead. Point me to which answer it is that makes this unambiguous. Well, and the reason, Your Honor, if I could, let me just answer that. If the reason there is not is because Lacks never came forward with any evidence to say, no, there was something else on sale. This proves Well, then because their argument is yours, it's not clear and convincing. The special master disagreed. Go ahead. Where is it? Line 16, and then I take it that the next line means the argument Wait a minute. Okay. The next line means the argument. The RTV silicone is to be placed around the lugs. Is that correct? That's an abbreviation for lug nut, lug nut hole, lug holes. And then potentially around it says if screws move around screws, what screws are we talking about? Answer. There was consideration of putting two screws in addition to the RTV and those potentially to move. We would need to put the RTV around the screws to prevent any moisture or contaminants from getting in between the cladding and the wheel. That corresponds to claims 11 and 25, in particular claim 25 of the patent. That was a stated concern in the patent. There's also reference to a discussion in column 6, I believe. I don't have the exact reference in front of me. But that is a nexus directly between what Ford was being exposed to. This is the Ford witness. What would happen if we disagreed? I'm trying to get at what we do with this case. Let's assume for purposes of argument that I disagreed with you and I said the evidence that's AA 1192-93 does not show by clear and convincing evidence the requisite nexus. I said that. And let's assume that was the only offer in the case. Ford, it's the only offer in the case and I say no nexus. What do we do? Who prevails? I think we still prevail because we haven't touched on the law of the case issue. But if you're going to ignore the law of the case issue. I'm not saying I rule against you on the law of the case issue. I'm just trying to frame what happens. You're ruling against me on the law of the case issue. Ford is the only instance and I say as a matter of law that's not nexus. Lacks says remand the case for damages. I don't know how you can do that. They filed a motion for summary judgment. Your standard is much different. Your standard is in the special master of the night. Why do you get another trial? What happened? I guess we have to. Why? You had the shot at the apple and you had it. I think we've proved it. But if you're saying that Lacks hasn't come forward. Lacks hasn't created any issue of fact as to there being something else offered. Lacks is saying the burden by clear and convincing evidence falls on your client to prove the nexus. And we believe we do. And I'm saying, you don't want to listen to me, but I'm saying assume hypothetically. I say you failed to make that proof. I would say no reasonable juror could find nexus on these facts. I mean, you're not going to agree with me, but I say assume I do that. Well, I don't know then we still have a trial because the procedural posture of the case was did the special master abuse his discretion? I mean, otherwise, if we fail to prove summary judgment, if that's what happens. What instructions do we give the special master for a remand? Assuming that we find as a matter of law that there was no on sale bar in this case on the summary judgment. Understood. I think you then have to go back. You have to look at the procedural posture of the case. In any case where a defendant moves for summary judgment and they fail to meet their burden, which is what you're positing here, you then go back and you have a trial. Well, not when there's another summary judgment that goes the opposite way pending. It depends just how badly they fail. But that's an abuse of discretion standard. You can only evaluate, he denied, the special master denied their motion. That's an abuse of discretion standard. There's a different standard. It's not the same standard that applies going both ways. So you have to then find to get to your point. What happens if we say as a matter of law, no reasonable juror could have ruled in your favor? Your summary judgment motion fails. It's gone. There is no on sale bar. Then why wouldn't it be an abuse of discretion of the trial court not to have a similar ruling coming up the other side? I think you'd have to find the record in all five situations is utterly devoid of any evidence. And you'd have to also ignore the law of the case rule to get over, to get to that point. Look, there are hurdles along the way. Sure. And in your case, I think your candidate and I respect you for this and the conversation we're having. If I took the Ford episode off of the record, you've got a less strong case on nexus, I believe, on the other four items. Ifrit's testimony here at 1192-93 sure struck me as the strongest evidence of record of nexus to an author. I agree with that. And if I take, let's assume, let's assume for purposes of argument, the court were to decide that the Ford case disappears from the record, not because it wasn't an offer, but because there's a failure of clear and convincing evidence that Ford received it, right, before the critical date. Because Ifrit said, well, I have to speculate. I'm not sure, blah, blah, blah, blah. So if Ford comes off the case, then you've got weaker grounds for nexus, right? And assume we were to say, well, I'm sorry, we don't see clear and convincing evidence of nexus in the other four things. I come back with the same question. What are we supposed to do, given the posture of the case? Again, I guess my answer would be unless you're willing to say the special master abused his discretion in denying the motion. And denying their, okay. Then we go back. Because now I guess I have to put Ifrit in any sum of judgment situation. I'm now entitled to put the witness on for the trier of fact to evaluate it. What you're saying is the evidence wasn't sufficient. But I can't believe you're not, you're saying that there isn't a scintilla of evidence here that supports the case. I believe there is. And, Your Honor, to your comment about, well, these were just to his notes, but his notes were part of that document. He testified that those were contemporaneous notes that he took when he got that document. And the RTE silicone appears in two places. The first page I showed you, which was the typewritten document by Lacks. And then on the second page. But what he's referring to, you can see from the context, is now let's finally turn to the handwritten notes and I'll ask you. So when he's discussing this, he's clearly referring to the handwritten notes. I don't disagree with you, Your Honor. Not one bit. All I'm saying is you see that reference to the RTE silicone in the notes and on the first page. So tell me, what exactly is the testimony about where these notes came from and when they got on this document? Sure. Who put them there? Yes. That's a very good question. It's in page 454 of the record. Yes. The chronology is this. There was the Lacks Technology Show in June of 1993. The testimony from Mr. Eifert is that he became interested as a Ford employee. He became interested in the concept being shown. He said, get me a — I don't want your lawyer to spin on the testimony. Show me the testimony. Okay. Tell me exactly which sentences you think support it. Because that's part of my problem is the special master here has a lot of statements that I can't find support for in the record. And there are no supports in his opinion. And so your — I'm sorry, Your Honor. Your question goes to which of the issue for — I apologize. I missed part of the question. That's okay. My question was where did these notes come from, when were they put there, and who put them, and where's the evidence in the record that substantiates all that? Okay. Okay. That was the question. That was the testimony of 1192 when Mr. Eifert was testifying about his — he's talking about his notes, that he put those on them. That's in that series of pages. Now, did he indicate by clear and convincing evidence when he believes he received this document? Well, he testified, yes, he does. When the offer was received, the testimony is fairly clear. This is a year — we're talking about approximately a year before the critical date. And that's why I think the chronology is important to understand here. And I can get you the record here in a second, finding my notes. But the testimony was, as I was explaining a second ago, that there was a chronology — there was a technology show. Mr. Eifert attended it. He testified to that. That's in the record. He then said, I'm interested in that proposal. Send me something on that. He then testified, and that's in that same — those same pages that I was just referring to, 1192. I'm not sure if it's the exact same page. It might be a page or two either way. But he testified then that he then received it. He discussed it. That's where the handwritten notes came from. All contemporaneous to this technology show in the date on the document, which I believe is June 21st or June 23rd, 1993. The critical date is not for a year later. There is no testimony or no suggestion. It absolutely makes no sense to think, why would they have been having a conversation post-critical date about a document dated 1993? There is no suggestion of any plausible explanation as to why they would have been discussing this document later. Well, did anybody ask Mr. Lacks whether he received it a year later? No. That question wasn't asked. It wasn't asked by him? Do you have any recollection of when this was provided to you? Question. Not precisely, no, sir. Do you have any recollection from whom it was provided to you? I don't have a recollection. Mr. Czarnota, will that be speculation? I agree with you that it's probably highly unlikely that the document wasn't actually delivered to him until more than a year after it was dated. But we're talking clear and convincing evidence here, right? And somebody could have, I believe these were asked on cross, but somebody on redirect could have said, well, Mr. Iford, do you believe that you actually didn't get this document until a year after it was dated? Absolutely not. I'm certain I must have received it fairly contemporaneously to when it was asked for. I didn't see that testimony. Well, didn't he testify somewhere, and I don't remember where it is right now, that he got it in or about June of 93? Is there something to that effect? I'm sorry. I was going to ask the last question. Go ahead. There is a reference on JA 1193. I think that that does fairly well nail down the date of receipt of the document. How about the exact page of the testimony? Well, I'm looking at it. There's a four-page reference there, pages 39 to 40. 454, isn't it? Yeah, pages 39 to 40, which is 1193. 1193. He was asked, do you know whether you received this drawing and the other materials within a year? Can you give me the, which, on 1193, there are four pages? Yes. I'm sorry about it. Page 40, so it's in the upper right-hand corner. If you look at line 6. Page 40? Page 40. Four. Four zero. Four zero. Yeah. Line 6. Line 6. Do you know whether you received this drawing and the other materials within a year of the June 21 timeframe? I think so. And the reason that you would have received them no later than June 6, 1994, there's no reason for me to think it was after that. I guess it's awfully vague. It's been so many years. How is that clear and convincing? Well, I'm looking for the better reference. I'm sorry. Yeah, you better because that doesn't sound by any stretch clear and convincing, does it? You think that's clear and convincing? I think so. I can't think of any reason. I guess it's awfully vague. That's your witness' testimony. Well. Are you going to tell me that's clear and convincing? In light of the chronology that I laid out, there is no plausible explanation for why he would have been talking about this a year later. They were trying to get a you have to go back to the 2000 trial. We put on extensive evidence in 2000 about all of these activities, the meetings that they had, a series of meetings. We focused extensively on the on-sale issue on these meetings with Ford. These were all contemporaneous events around that time frame. There was nothing going on with this document, with this offer, more than a year later. So is he precise as to the exact date? No, he's not precise as to the exact date. I want to argue. We also know that there were ongoing discussions after June of 93 between Lacks and Ford about the very same subject matter. In fact, there were discussions that went on, you know, after the critical date, right, between those two parties dealing with the same subject matter, wheels. And so we don't know at what stage in the game a document that was dated June of 93 was put into the possession of Ford. It's rather important because it's got to be before the critical date by clear and convincing evidence. Sure. If you go back to page 39, and I'm, again, just refreshing myself. It's been a couple days since I read this, but it says on line 11, I'm just trying to understand the time frame. Would you have had the time between, I'm going to say, June and July when you think you may have received this document? Would there have been time for Ford or Lacks or whomever to perform these tests and get satisfactory results and prove out the product in time for the model year you're shooting for? Yes, there should have been. That's not the page I'm looking for either. I don't have the exact reference, but at this particular time. But there is no other testimony in the record as to, yes, I could have got it in 2000, I could have got it in 2003. Counsel, you didn't ask him for a specific date. Your question to him was on page 40, line 6, do you know whether you received it within a year? And he couldn't even say yes. He said, I think so. I'm awfully vague. Well, he said no. I just want you to tell me, is that clear and convincing evidence? He says, is there any reason to think you would have received it later than, I mean, after then, June 6th? No, there's no reason for me to think it was after that, I guess. Okay, so he qualified it with I guess. I believe it is, absolutely. Wow. Really? I do. Yes, I do. I do. In light of the absolute, the rest of the chronology and the facts in the record, I do. Mr. Underwood. Why doesn't all this evidence at least raise a material question of fact, even if it's not clear and convincing, such that while we might reverse what the special magistrate has done in this case, we can't necessarily give you what you're asking for, which is the home run of the absolute flip? Because the finding of an on sale bar is an issue of law. And this court is just as well suited to look at the record here and come to a determination. Why isn't this creating a question of fact? Because there are no facts here. You're looking at the testimony, and I think the colloquy that I heard between counsel and the court a few moments ago amply demonstrated the foolhardiness of trying to develop a record such as they developed based upon testimony at that point 12 years old. The record is replete with I don't know's, I'm not sure's. Again, that's not clear and convincing evidence. In a trial, the context, as he suggested, could be presented to show that at this time there were lots of conversations going on between these two companies all about the use of this patented method on products. And this gentleman could then testify and say my best recollection is I received it before. I believe the record is very clear, Your Honor.  You can reach the conclusion that no reasonable jury could come to the conclusion that there is clear and convincing evidence that Mr. Evert's comments that he made in his notes at some time, we don't know when, were in fact before the critical date of the patent and in fact excluded the method claims from any other types of claims. Arguably, even a full-face application of adhesive would be described by what he said in his comments. I may return to the thought about the RTV. If I could direct the Court's attention to the record JA444, actually on page 29 of Mr. Lee Chase's deposition testimony. He's the engineer who developed the patents in Sioux and he is the individual involved in many of these activities. He testifies that RTV adhesive or RTV foam adhesive is not going to be a determinative factor as to whether there are voids or gaps left after the wheel was assembled. Now here he is, the gentleman who invented the patent in Sioux, saying that the specification of RTV simply does not tell us whether or not a selective application of adhesive is going to be used. It's used in other applications as well. And as a matter of fact, there's a wheel that was sold or at least presented to a company called Dexter that used RTV in a full-face application of adhesive and that can be found at JA739, JA748. Can I get something clear in my mind on the cross motions for summary judgment after the remand? Am I correct in thinking that your adversary moved for a summary judgment saying the record as developed after remand shows that the invention was on sale? And you crossed moves saying the record developed post remand shows, as a matter of law, that there was no on-sale bar. Was that the posture of the cross motion? Yes, sir. Yes, sir. At one stage in the game in this case, there was some question as to whether the defendant's conduct had triggered a bar. Wasn't there? There was, but that was decided in the earlier case. I just want to make certain. I'm assuming that you would agree with your adversary that if for some reason we ruled as a matter of law that the summary judgment against your client on the on-sale bar was wrong, if we were to additionally decide that the district court abused its discretion in not granting your summary judgment, those two combined rulings would result in a remand for calculation of damages. The issue would be over. Yes, sir. That's exactly correct. Thank you.  Thank you, Your Honor. Thank you.